# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

ARTHUR GILFUS,

      Plaintiff,

v.                              Case No: 8:18-cv-2941-CEH-CPT

MCNALLY CAPITAL, LLC,

      Defendant.

_____/

## ORDER

This matter comes before the Court on the parties' cross motions for summary judgment. Plaintiff Arthur Gilfus moves for partial summary judgment in his favor as to liability on his breach of contract claim (Doc. 88), Defendant responded in opposition (Doc. 109), and Plaintiff replied (Doc. 117). Defendant McNally Capital LLC moves for summary judgment in its favor on all of Plaintiff's claims (Doc. 89). Plaintiff responded in opposition (Doc. 111), and Defendant replied (Doc. 115). The Court, having considered the motions, the parties' stipulated facts, and being fully advised in the premises, will deny Plaintiff's Motion for Partial Summary Judgment and grant-in-part and deny-in-part Defendant's motion.

## I.      BACKGROUND AND FACTS[1]

---

[1] The Court has determined the facts, which are undisputed unless otherwise noted, based on the parties' submissions, including the parties' Joint Stipulations of Agreed Material Facts (Docs. 131, 132), depositions, affidavits and attachments thereto. *See* Docs. 88-1–88-4; 90–95; 110; 112–113. McNally moved to strike the second declaration of Gilfus, which the Court

A.      First Nondisclosure Agreement ("First NDA")

On December 28, 2016, an entity to be formed by Plaintiff Mark Gilfus

("Gilfus"), Mark Hollister ("Hollister") and Terry North ("North") on the one hand

("the Company"), and Defendant McNally Capital, LLC ("McNally") on the other

hand, entered into a non-disclosure agreement (the "First NDA"). Doc. 131 ¶ 2; Doc.

132 ¶ 3. 4. The First NDA provided, in pertinent part, that:

> McNally agrees that the Evaluation Material shall be used
> for the purpose of evaluating a possible transaction between
> the Company and McNally, and that such information shall
> be kept confidential by McNally, its advisors, and its clients;
> provided however, that (i) any of such information may be
> disclosed to its officers, employees, advisors, clients, agents,
> potential financing sources and representatives
> (collectively, "Representatives") who need to know such
> information for the purpose of evaluating any such possible
> transaction between the Company and McNally (it being
> understood that its Representatives shall be informed by
> McNally of the confidential nature of such information and
> shall be directed by McNally to treat such information
> confidentially), (ii) any other disclosure of such information
> to third parties who are not Representatives may be made
> to which the Company consents in writing, and (iii) any of
> such information may be disclosed when such disclosure is
> required by a court having applicable jurisdiction.
> . . .
> Provided that, however, nothing in this letter shall prevent
> McNally form evaluating a possible investment in,
> collaborating with, and/or entering into a transaction with
> (including an investment in) a company whose business is
> similar to or competitive with the business of the Company.
> Please note that McNally deals with many companies,
> some of which may, independently of McNally, pursue
> similar or competitive paths regarding their products or
> services, technology and/or market development plans to

---

denied. Docs. 116, 148. For purposes of summary judgment, the Court presents the facts in
the light most favorable to the non-moving party as required by Fed. R. Civ. P. 56.

those which are or may be pursued by the Company. The occurrence or existence of such similar or competitive activities shall not by itself be cause for any action or allegation by the Company the [sic] McNally has failed to observe its confidentiality obligation set forth above.

. . .

Unless and until a definitive agreement between the Company and McNally with respect to the transaction which is the subject of this letter has been executed and delivered, except for the matters specifically agreed to in this letter, neither the Company nor McNally shall be under a legal obligation of any kind whatsoever with respect to such a transaction by virtue of this letter or any written or oral expression with respect to such a transaction by any of the Company's directors, officers, employees, agents or any other representatives or the Company's advisors or representatives thereof.

Doc. 88-2.

### B.     Undisputed Facts Regarding Plaintiff's Motion for Partial Summary Judgment

David Lovejoy introduced McNally to Gilfus in late 2016. Doc. 132 ¶ 1. On December 28, 2016, McNally and the Company entered into the First NDA related to the Nortrax Venture, prior to engaging in discussions, with the understanding that the First NDA was a binding and enforceable contract. *Id.* ¶¶ 3, 5. After entering into the First NDA, Gilfus and two other individuals provided McNally with the "Nortrax Venture" document, the contents of which McNally was unaware at the time of receiving it. *Id.* ¶ 7. Prior to executing the First NDA, McNally had not engaged in the market for construction and forestry equipment. *Id.* ¶ 8.

McNally participated in discussions with Gilfus as to how it could best market the idea referenced in the Nortrax Venture document to McNally's clients and

potential financing sources. *Id.* ¶ 9. Gilfus had discussions with Frank McGrew, a trusted advisor to Dobbs Management Services, LLC. *Id.* ¶ 10. McNally communicated with and met Gilfus to discuss the idea in the Nortrax Venture Document with Dobbs, McNally's client and potential financing source. *Id.* ¶ 11. In accordance with the explicit terms of the First NDA that allowed McNally to share the Nortrax Venture Document with "clients . . . [and] potential financing sources," Gilfus discussed information contained in the Nortrax Venture Document with Dobbs' representatives. *Id.* ¶ 12. The First NDA provided that "[t]he observance of the mutual confidentiality agreements set forth [in the agreement] shall remain in effect for a period of one (1) year from the date of signature," and the First NDA was signed on December 28, 2016. *Id.* ¶ 13. McNally has not compensated Gilfus in any respect. Doc. 60 ¶ 52.

### C. Undisputed Facts Regarding McNally's Motion for Summary Judgment

On December 23, 2016, Gilfus emailed McNally and stated that he wanted to present McNally with an opportunity to "acquire an established business from a world leading manufacturer," stated that the acquisition opportunity was a company called Nortrax Equipment Company ("Nortrax"), and provided Nortrax's website address. Doc. 131 ¶ 1. On December 28, 2016, the Company and McNally entered into the First NDA. *Id.* ¶ 2. Gilfus, Hollister, and North ultimately agreed not to form the "Company" referred to in the First NDA, and the "Company" was never formed. *Id.* ¶¶ 3, 4.

The First NDA provides that Evaluation Material "may be disclosed to [McNally's] . . . clients . . . potential financing sources and representatives . . . who need to know such information for the purpose of evaluating any such possible transaction." *Id.* ¶ 5. Additionally, the First NDA provides that "Unless and until a definitive agreement between the Company and McNally with respect to the transaction which is the subject of this letter has been executed and delivered, except for the matters specifically agreed to in this letter, neither the Company nor McNally shall be under a legal obligation of any kind whatsoever with respect to such a transaction by virtue of this letter or any written or oral expression with respect to such a transaction by any of the Company's directors, officers, employees, agents, or any other representatives or the Company's advisors or representatives thereof." *Id.* ¶ 6.

The First NDA does not state that McNally agreed to provide Gilfus or the Company with a finder's fee, equity, or employment. *Id.* ¶ 7. Gilfus does not have any written agreement in which McNally agreed to provide him with a finder's fee, equity in a new company, an employment agreement, or a guarantee of employment. *Id.* ¶¶ 8, 9, 10. The Parties never reached agreement on the amount of any finder's fee because the number on which a finder's fee would be based was never determined. *Id.* ¶ 11. The Parties never reached agreement on the amount of equity capital that the management team would receive had a transaction been consummated, and did not get to the point where they could have those discussions. *Id.* ¶ 12. The Parties' discussions did not reach a level of specificity where the terms of employment agreements were ever defined. *Id.* ¶ 13. The only express written agreement between

McNally and "the Company" as defined in the First NDA is the First NDA itself. *Id.* ¶ 14. The only express written agreement with McNally that Gilfus signed was the First NDA. *Id.* ¶ 15.

Nortrax is a captive subsidiary of Deere & Company (known as "John Deere"). *Id.* ¶ 16. Nortrax sells heavy equipment such as bulldozers and backhoes for the construction, mining, forestry and utility industries. *Id.* As of 2017, Nortrax operated dealerships in approximately 50 locations across the United States and Canada. *Id.* Gilfus researched McNally and concluded that McNally "had absolutely no experience with heavy equipment," and "had never done anything like" the deal Gilfus hoped would form. *Id.* ¶ 17. Gilfus, Hollister, and North had a far more extensive knowledge of the heavy-equipment industry than anyone at McNally. *Id.* ¶ 18. At 11:29 p.m. on January 2, 2017, North emailed a 10-page document entitled "Nortrax Venture" to McNally (the "Nortrax Venture Document"). *Id.* ¶ 19. The transmittal email does not expressly state that the Nortrax Venture Document is confidential.

Hollister testified that Nortrax did not agree to allow Gilfus, Hollister, or North to use its financial information, nor did he ask Nortrax for permission to use its confidential information. *Id.* ¶¶ 22, 23. Gilfus used confidential information of Nortrax and/or John Deere in creating the Nortrax Venture Document. *Id.* ¶ 24. Gilfus used confidential information of Nortrax and/or John Deere because, in his words, "[h]onestly, I needed it" to "have a basis to start" creating the Nortrax Venture Document, and because he and his partners "had the opportunity" to use it however

it was obtained. *Id.* ¶ 25. Gilfus knew that Hollister no longer worked for Nortrax before Hollister obtained and Gilfus used the confidential information of Nortrax or John Deere in creating the Nortrax Venture Document. *Id.* ¶ 26.

On January 3, 2017, Ward McNally (the founder and Managing Partner of McNally) and Frank McGrew ("McGrew") (a Managing Partner and the Chief Compliance Officer for McNally) spoke by telephone with Gilfus, Hollister and North. *Id.* ¶ 27. This was the first, and the only, time Ward McNally ever spoke with Gilfus. *Id.* On March 6, 2017, McNally and John Deere signed a Mutual Non-Disclosure Agreement (the "Second NDA") to allow for discussions regarding a possible acquisition relating to Nortrax. *Id.* ¶ 28. On March 14, 2017, Frank McGrew emailed Gilfus stating that "I was also thinking we should get you to execute a joinder so you are covered under the [Confidentiality Agreement] with McNally and Deere." *Id.* ¶ 29. The joinder that McGrew asked Gilfus to sign permitted Gilfus to be included in discussions with John Deere and permitted Gilfus to obtain authorized access to John Deere's confidential information. *Id.* ¶ 30. On March 15, 2017, Gilfus executed a Joinder to the Second NDA on behalf of his consulting firm, HPD Advisors. *Id.* ¶ 31. On June 6, 2017, Gilfus, Hollister, and North consented to McNally revealing their identities to John Deere and Nortrax. *Id.* ¶ 32.  Prior to this time, Gilfus, Hollister, and North requested that McNally not disclose their involvement to anyone, including anyone at John Deere or Nortrax. *Id.*

McNally provided the Nortrax Venture Document to Dobbs Management Service, LLC ("Dobbs") to seek Dobbs's interest in a transaction involving Nortrax.

*Id.* ¶ 33. Dobbs was one of McNally's clients and a potential financing source for a venture involving Nortrax at the time McNally shared the Nortrax Venture Document with Dobbs. *Id.* ¶ 34.  Gilfus and his partners knew McNally was going to share the Nortrax Venture Document with Dobbs. *Id.* ¶ 35. Gilfus and his partners wanted McNally to share the Nortrax Venture Document with Dobbs. *Id.* ¶ 36. Gilfus believed Dobbs was "a perfect match" for a potential Nortrax venture. *Id.* ¶ 37. Gilfus did not object to disclosure of the Nortrax Venture Document to Dobbs and did not demand Dobbs return the Nortrax Venture Document. *Id.* ¶ 38. Gilfus does not seek relief in this case on the grounds that McNally shared the Nortrax Venture Document with Dobbs. *Id.* ¶ 39.

On June 5, 2017, Frank McGrew emailed Chris Crosby ("Crosby") of Dobbs, stating: "[I] want to discuss when and how to get Art Gilfus and the other Deere proposed management team in front of you. I have them under NDA already so just need to get your blessing and discuss how they can be helpful to diligence and constructing the plan on go forward basis." *Id.* ¶ 40. Gilfus participated in a call with Chris Crosby and others from Dobbs on June 8, 2017. *Id.* ¶ 41.  Following that call, Gilfus and Hollister traveled to Memphis to meet with Dobbs on June 16, 2017. *Id.* On June 19, 2017, Gilfus, in a thank you email and in response to a prior offer for Dobbs to directly pay Gilfus consulting fees, stated to Dobbs: "Thank you as well for your offer to reimburse us for our airfare to Memphis and to compensate us as consultants in the diligence process. We do not wish to be reimbursed or compensated as this has been a long labor of 'professional love' for us. We wish only to be of

assistance in any way possible and to see Nortrax SE in the hands of a good owner where its true potential can be unlocked. Having said this, we have never turned down a good steak and a few beers as compensation for anything!" *Id.* ¶ 42.

On June 19, 2017, Crosby emailed McGrew to say that he was hesitant to proceed with Gilfus and Hollister in a managerial role because "I don't think they are the guys" and later added that he could "probably not get comfortable with Art as a CEO." *Id.* ¶ 43. John Deere is very particular, including in choosing its business partners, to protect its brand. *Id.* ¶ 44. John Deere would have to agree to any proposed venture involving Nortrax. *Id.* ¶ 45. John Deere was not interested in selling Nortrax in its entirety; instead, John Deere was only interested in a family office purchasing one or more of its Nortrax dealerships. *Id.* ¶ 46. Former John Deere executive Mark Germain declared that John Deere would not be interested in selling any Nortrax dealerships if Gilfus or Hollister would be involved with their management. *Id.* ¶ 47. Former John Deere executive Mark Germain and Dobbs' executive Chris Crosby declared that John Deere and Nortrax would not sell Nortrax to a sponsor who intended to use Hollister, whom Germain claimed Nortrax fired for cause, in a senior management role. *Id.* ¶ 48.

In 2017, Dobbs purchased seven dealership locations in Florida from Nortrax. *Id.* ¶ 49. Dobbs did not purchase Nortrax in its entirety. *Id.* ¶ 50. McNally did not purchase Nortrax or any portion of Nortrax. *Id.* ¶ 51. Ward McNally declared that a McNally entity made a small (3.9%) co-investment in the holding company that owns Dobbs' interests in these seven dealerships. *Id.* ¶ 52.

9

## II.    LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex*, 477 U.S. at 323; *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004). That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing that there is a genuine issue of material fact. *Id.* at 324. Issues of fact are "genuine only if a reasonable jury, considering the evidence present, could find for the nonmoving party," and a fact is "material" if it may affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). In determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. *Celotex*, 477 U.S. at 323. However, a party cannot defeat summary judgment by relying upon conclusory allegations. *See Hill v. Oil Dri Corp. of Ga.*, 198 F. App'x 852, 858 (11th Cir. 2006).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed. *Am. Bankers Ins. Group v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). The Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. *Id.* The Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984). Cross-motions may, however, be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts. *Id.* at 1555–56.

## III.    DISCUSSION

In this business dispute, Gilfus sued McNally under four theories: breach of contract, breach of fiduciary duty, promissory estoppel, and unjust enrichment. Doc. 38. Plaintiff moves for partial summary judgment as to liability on his breach of contract claim in Count I. Doc. 88. For the reasons discussed below, that motion is due to be denied. McNally moves for summary judgment on all claims. Doc. 89. McNally's motion will be granted as to Gilfus's breach of contract, breach of fiduciary duty, and promissory estoppel claims and denied as to Gilfus's unjust enrichment claim. The Court addresses each claim in turn.

## A.      Breach of Contract

To state a claim for breach of contract under Illinois law,[2] a plaintiff must allege "the existence of a valid and enforceable contract, performance by the plaintiff, breach of the contract by the defendant, and resultant damages or injury to the plaintiff. . . . A valid and enforceable contract requires an offer, an acceptance, and consideration." *Sheth v. SAB Tool Supply Co.*, 990 N.E.2d 738, 754 (Ill. App. Ct. 2013) (internal citations and quotation marks omitted).

### 1.      McNally's Motion for Summary Judgment

McNally moves for summary judgment in its favor on Count I arguing there is no disputed question of fact that it is entitled to judgment as a matter of law on Gilfus's breach of contract claim. Specifically, McNally argues Gilfus's contract claim fails because he lacks standing to sue individually for breach of the First NDA; the Evaluation Material consisted of confidential information belonging to Nortrax that was used by Gilfus and Hollister without Nortrax's consent; the First NDA did not preclude McNally from sharing the Evaluation Material with Dobbs as a client and potential financing source and thus there was no breach; Gilfus has no cognizable damages based on the possibility of a finder's fee, equity, or employment; Gilfus fails to establish damages based on expenses and effort; and McNally was not the proximate cause of Gilfus's damages because Nortrax and Deere refused to deal with Gilfus. Doc. 89.

---

[2] The First NDA provides that the agreement is governed by Illinois law. Doc. 88-2 at 2.

### i. No Breach of the First NDA

The Court first addresses the lack of breach because it is dispositive of Gilfus's

claim in Count I. In his Amended Complaint, Gilfus alleges:

> Defendant materially breached the First NDA when it
> shared and used Plaintiff's confidential Evaluation Material
> with at least one known third party, to-wit: Dobbs.

Doc. 38 ¶ 62. McNally argues there was no breach because it appropriately shared the

"Evaluation Material"[3] with Dobbs. Indeed, the First NDA specifically contemplates

that the Evaluation Material may be disclosed by McNally to its clients and to

potential financing resources. *See* Doc. 88-2 at 1. It is undisputed that Dobbs is a client

and potential financing source. Doc. 131 ¶ 34; Doc. 132 ¶ 11. Thus, no breach occurred

by McNally's disclosure of the Evaluation Material to Dobbs. Gilfus has abandoned

this theory as evidenced by the stipulated facts. *See* Doc. 132 ¶ 12 (Gilfus stipulates

that the Evaluation Material was shared with Dobbs pursuant to the First NDA); Doc.

131 ¶ 39 (Gilfus does not seek relief in this case on the grounds that McNally shared

the Nortrax Venture Document with Dobbs.).

Gilfus now concedes that the breach of the First NDA is not in the disclosing

of the information to Dobbs, and instead he argues McNally breached the First NDA

by facilitating a deal with Dobbs, Nortrax, and Deere that did not include Gilfus. Doc.

111 at 23. However, the First NDA does not preclude such conduct. Thus, Gilfus fails

---

[3] McNally argues that the Evaluation Material was created using information taken from
Nortrax without its consent, and thus it submits that the information shared did not belong
to Gilfus in the first instance.

13

to establish any "breach" under the First NDA, and his breach of contract claim fails as a matter of law. In relevant part, the First NDA provided:

> [N]othing in this letter shall prevent McNally from evaluating a possible investment in, collaborating with, and/or entering into a transaction with (including an investment in) a company whose business is similar to or competitive with the business of the Company. Please note that McNally deals with many companies, some of which may, independently of McNally, pursue similar or competitive paths regarding their products or services, technology and/or market development plans to those which are or may be pursued by the Company. The occurrence or existence of such similar or competitive activities shall not by itself be cause for any action or allegation by the Company the [sic] McNally has failed to observe its confidentiality obligation set forth above.

Doc. 88-2. The First NDA is titled "Confidentiality Agreement." *Id.* Construing the agreement in a light favorable to Gilfus, no reasonable jury could find that any other promises were made by this agreement other than to maintain the confidentiality (except when otherwise permitted to be disclosed) of the Evaluation Material. Contrary to Plaintiff's argument that the agreement prohibited pursuing a deal without him, a plain reading of the First NDA reveals there were no promises or guarantees of a transaction that included Gilfus. As evidenced by the quoted language above, the First NDA explicitly states that nothing about the agreement precludes McNally from evaluating and entering into a potential related investment with another company. And, "[t]he occurrence or existence of such similar or competitive activities shall not . . . be cause for any action . . . [that] McNally has failed to observe its confidentiality obligation set forth [in the agreement.]" Thus, Gilfus cannot claim that the First NDA

14

has been breached due to McNally engaging in competitive activity when the First NDA specifically contemplates that could happen and declares that such activity shall not be a "cause of action" for breach of the confidentiality agreement.

Gilfus's revisionist version of what constitutes a breach under the agreement claims that McNally breached the First NDA by using the Evaluation Material to pursue a transaction that did not include him. In support, he cites to language in the agreement that states the information may be disclosed to a potential financing source "for the purpose of evaluating any such possible transaction between the Company and McNally." Doc. 88-2 at 1. Gilfus argues this is the *only* purpose for which the information may be used. But that is not what the agreement says, even when viewed in a light most favorable to Gilfus. The agreement does not use the word "only" or any other limiting language. To the contrary, the First NDA states: "Provided that, however, nothing in this letter shall prevent McNally from evaluating a possible investment in . . .  and/or entering into a transaction with . . . a company whose business is similar." *Id.* The First NDA did not preclude McNally from collaborating with others. In fact, the First NDA specifically alerted Gilfus that McNally deals with many companies, some of which may pursue a similar or competitive path to that of Gilfus's Company. Moreover, it was Dobbs and Deere who entered into the Nortrax deal. And, critically, neither Deere nor Dobbs were signatories to the First NDA and there are no claims being pursued against Deere or Dobbs in this action.[4]

---

[4] The Court is cognizant of Gilfus's efforts to amend to add Dobbs as a party, but given the late stage of the litigation, such amendment was inappropriate. However, such ruling did not

Gilfus concedes that revealing the Evaluation Material to Dobbs was permitted under the First NDA, and he fails to direct the Court to any provision in the First NDA that precluded McNally from evaluating, collaborating, or entering into a transaction with a company whose business is similar to Gilfus's. Under Illinois law, "[t]he primary objective in construing a contract is to give effect to the intent of the parties." *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007) (citations omitted). "The intent of the parties is not to be gathered from detached portions of a contract or from any clause or provision standing by itself." *Id.* (citing *Martindell v. Lake Shore Nat'l Bank*, 154 N.E.2d 683 (Ill. 1958)). "A court must initially look to the language of a contract alone, as the language, given its plain and ordinary meaning, is the best indication of the parties' intent." *Gallagher*, 874 N.E.2d at 58. In so doing, a contract "must be construed as a whole, viewing each part in light of the others." *Id.* Review of the plain language of the First NDA, as a whole, reveals it did not preclude McNally from pursuing other transactions that did not include Gilfus.

The First NDA further provides:

> Unless and until a definitive agreement between the Company and McNally with respect to the transaction which is the subject of this letter has been executed and delivered, except for the matters specifically agreed to in this letter, *neither the Company nor McNally shall be under a legal obligation of any kind whatsoever with respect to such a transaction* by virtue of this letter . . . .

---

preclude Plaintiff from filing a separate action against Dobbs. The Court is unaware of whether Plaintiff initiated a separate action against Dobbs.

Doc. 88-2 at 2 (emphasis added). It is undisputed there was no definitive agreement entered into between Gilfus and McNally. Doc. 91-1 ¶ 8. Thus, no legal obligation arose under the First NDA as it relates to any transaction involving Nortrax until a definitive agreement was in place.[5]  Because no question of fact exists that there was no breach by McNally under the terms of the First NDA, Gilfus's motion for summary judgment as to Count I is due to be denied. And McNally's motion for summary judgment on Count I is due to be granted.

### ii. Other issues argued by McNally

Although the Court finds that McNally is entitled to summary judgment on Count I because there was no breach of the First NDA, the Court will briefly address the other issues raised by McNally in its motion on this claim. First, McNally argues that Gilfus lacks standing to individually bring a claim for breach of contract. In support, McNally agues that Gilfus cannot pursue a remedy, individually, based on an agreement entered into by the Company to be formed consisting of Gilfus, Hollister, and North. The First NDA was signed by Gilfus, North, and Hollister "By and For the Company." Doc. 88-2 at 2. Under Illinois law, "[i]t is settled that if an injury is incurred by the corporation, then the shareholders can only sue upon a derivative basis and not as individuals." *Bio–Scientific Clinical Lab., Inc. v. Todd*, 501 N.E.2d 192, 195 (Ill. 1986). However, a shareholder with a direct, personal interest in a cause of action may bring a lawsuit against a defendant even if the corporation's

---

[5] This is not to say that McNally's pursuit of a venture without Gilfus is not actionable. However, as discussed, such pursuit is not a breach of the plain language of the First NDA.

rights are also implicated. *See Franchise Tax Board v. Alcan Aluminum Ltd.*, 493 U.S. 331, 336 (1990). In a light favorable to Gilfus, he asserts a direct, personal interest in the claim.

The undisputed evidence reveals, however, that the "Company" was never formed. Doc. 131 ¶¶ 3, 4. McNally contends that even if not acting on behalf of the "Company," Gilfus and his partners were acting as a *de facto* partnership, and as such, any claim or remedy sought must be brought either under (1) the name of the partnership or, alternatively, (2) under the names of all partners doing business as the partnership. Under Illinois law, "[a] partnership may sue or be sued in the names of the partner as individuals doing business as the partnership, or in the firm name, or both." 735 Ill. Comp. Stat. Ann. 5/2-411(a). Here, Gilfus sues in his own name individually. The record reveals that neither Hollister nor North were interested in being involved in the lawsuit.

Gilfus responds that he was acting as a promoter of the company, and as such, has standing to sue. A promoter of a corporation is one who actively assists in creating, projecting and organizing a corporation. *Tin Cup Pass Ltd. P'ship v. Daniels*, 553 N.E.2d 82, 85 (Ill. App. Ct. 1990) (citations omitted). "[W]hether personal liability will be imposed upon a promoter who makes a contract for the benefit of a proposed corporation depends upon the intent of the parties." *Id.* Disputed issues of fact exist as to whether Gilfus was acting as a partner or a promoter when he signed the First NDA. Thus, McNally's standing argument is rejected as a basis for finding in its favor.

As to McNally's damages argument, it is undisputed the First NDA does not provide Gilfus or the Company with a finder's fee, equity, or employment. Doc. 131 ¶ 7. Thus, such damages cannot form the basis of Gilfus's claim for damages in Count I. However, the Court rejects McNally's argument that no damages at all may be claimed. The Court declined to strike Gilfus's Second Declaration which included, at a minimum, assertions that he suffered some damages. In a light favorable to Gilfus, he has put forth evidence of damages.

Finally, McNally argues that it was not the proximate cause of Gilfus's damages because Nortrax and Deere refused to deal with Gilfus. McNally's argument on this point is well-taken. Although Gilfus may be able to offer some evidence that he sustained damages, albeit minimal, he fails to show that McNally caused the damages because the undisputed evidence shows that Deere and Nortrax would not have entered into a business venture with Gilfus in any event. *See* Doc. 92-1 ¶ 5 (Declaration of Mark Germain).

2.    *Plaintiff's Motion for Partial Summary Judgment (Doc. 88)*

Plaintiff seeks partial summary judgment in his favor as to liability on his breach of contract claim arguing that the First NDA is a valid and enforceable contract and that McNally breached the First NDA by using the confidential information that he provided in order to acquire John Deere dealerships without including Gilfus in on the deal.  Doc. 88. Gilfus complains he has been damaged as a result, which damages he submits should be decided by the trier of fact. McNally responds that the motion should be denied because Gilfus lacks standing to assert the claim in his individual

capacity where he entered the agreement as a company or, at least, a partnership. Next McNally argues that Gilfus failed to adduce evidence showing damages or that McNally was the proximate cause of any damages to Gilfus. Finally, McNally argues that Gilfus has not established any breach of the First NDA. Doc. 109. As addressed in the section above, no disputed question of fact exists that there was no breach of the First NDA because disclosure of the Evaluation Materials under the agreement was permitted, and no other legal obligation was created by the agreement. Accordingly, Plaintiff's Motion for Partial Summary Judgment on his breach of contract claim is due to be denied.

### B.   Breach of Fiduciary Duty

In Count II, Gilfus sues McNally for breach of fiduciary duty alleging McNally pursued a transaction to acquire Nortrax without including Gilfus in the venture. *See* Doc. 38. The elements of a claim for breach of fiduciary duty under Florida law are: "the existence of a fiduciary duty, and the breach of that duty such that it is the proximate cause of the plaintiff's damages." *Gracey v. Eaker*, 837 So. 2d 348, 353 (Fla. 2002). Gilfus concedes that the potential venture began as an arm's-length relationship, which ordinarily would not create a fiduciary duty. *See Taylor Woodrow Homes Fla., Inc. v. 4/46-A Corp.*, 850 So. 2d 536, 541 (Fla. 5th DCA 2003) (holding that a fiduciary relationship does not exist when parties are dealing at arm's length "because there is no duty imposed on either party to protect or benefit the other"). But he asserts that McNally's subsequent conduct created a fiduciary duty by engendering Gilfus's trust and confidence. Doc. 38 ¶ 68. McNally moves for summary judgment in

its favor because Gilfus fails to establish the existence of a fiduciary duty as a matter of law and, even if a duty existed, he fails to show a breach of the alleged fiduciary duty. *See* Doc. 89 at 19. The Court agrees.

The Court must first determine whether a fiduciary relationship existed. In Florida, a fiduciary relationship exists "when there is a relationship of trust and confidence between parties, where confidence is given by one and trust is accepted by the other." *Amoco Oil Co. v. Gomez*, 125 F. Supp. 2d 492, 509 (S.D. Fla. 2000) (citation omitted). A plaintiff alleging an implied fiduciary duty must offer "substantial evidence showing some dependency by one party and some undertaking by the other party to advise, counsel, and protect the weaker party." *Swerhun v. Gen. Motors Corp.*, 812 F. Supp. 1218, 1223 (M.D. Fla. 1993) (citing *Lanz v. Resolution Tr. Corp.*, 764 F. Supp. 176 (S.D. Fla. 1991); *Cripe v. Atl. First Nat'l Bank*, 422 So. 2d 820 (Fla. 1982)).

To survive a motion for summary judgment, a party alleging an implied fiduciary relationship must show that confidence was "reposed as a result of the position of superiority and influence" held by the other party. *Amoco Oil*, 125 F. Supp. 2d at 509 (citing *Becks v. Emery–Richardson, Inc.*, No. 86–6866–CIV, 1990 WL 303548 *28 (S.D. Fla. Dec. 21, 1990)). Although the issue of whether a fiduciary relationship exists is a question of fact, *see Morton v. Young*, 311 So. 2d 755, 756 (Fla. 3d DCA 1975), a plaintiff cannot prevail by merely showing that he or she placed his trust and confidence in the defendant; the plaintiff must also introduce "substantial evidence" that the defendant "recognized, accepted, or undertook the duties of a fiduciary—that of advising, counseling, and protecting [the plaintiff]." *Amoco Oil*, 125 F. Supp. 2d at

509 (citing *Swerhun*, 812 F. Supp. at 1223); *see also Lanz*, 764 F. Supp. at 179 (holding that advice from defendant to plaintiff did not create a fiduciary relationship).

Here, Gilfus argues that he depended on McNally because of McNally's "superior knowledge and skill." Doc. 111 at 21–22. However, the record does not support Gilfus's contention that the relationship was so one-sided. To the contrary, the parties agree that Gilfus, Hollister, and North had far more extensive knowledge of the heavy-equipment industry than anyone at McNally. Doc. 131 ¶ 18.  Although Gilfus asserts that he "placed absolute trust in [McNally's] access to acquisition financing sources and its knowledge of how to bring acquisition transactions to fruition and its continued assurance that it was representing [Gilfus] for the mutual betterment of both parties as part of a circle of friends," *id.* at 25–26, the mere fact that one party trusts or depends on the other, without more, does not create a fiduciary relationship. *Amoco Oil Co.*, 125 F. Supp. 2d at 509. As McNally notes, Gilfus must also show "some degree of undertaking on the other side to advise, counsel, and protect the weaker party." Doc. 89 at 19 (quoting *Weinberg v. Advanced Data Processing, Inc.*, 147 F. Supp. 3d 1359, 1367 (S.D. Fla. 2015)). Gilfus fails to direct the Court to record evidence demonstrating that McNally took on that role as adviser, counselor, or protector. Email exchanges reflected the parties were on equal footing as opposed to one party being in a superior position. By way of example, in one email Terry North asks Frank McGrew if McNally has a form confidential agreement it is "most comfortable with" or if North should send his. This exchange does not show the one-sided dependency that Gilfus claims. Although Gilfus argues that he depended on McNally's superior

knowledge about financing mergers and acquisitions, he concedes that he likewise had superior knowledge of the construction equipment industry (Doc. 111 at 26 n.11), which supports that Gilfus and McNally sought each other's expertise in the proposed arms-length venture.

The record does not reflect that McNally undertook a duty to advise, counsel, and protect Gilfus. Gilfus argues that his trust in and dependency on McNally created a fiduciary relationship, but mere trust reposed by one party without undertaking by the other does not create a fiduciary relationship. *Amoco Oil*, 125 F. Supp. 2d at 509. Although the existence of a fiduciary relationship is a fact-intensive inquiry, Gilfus points to no facts to demonstrate an undertaking by McNally to elevate their dealings beyond an arm's-length relationship. In a light favorable to Gilfus, at most, he cites to his own claims that he placed his absolute trust in McNally and its financing knowledge and McGrew's description of the three of them as a "circle of friends." Doc. 111 at 28. Nothing about this "circle of friends" comment creates a genuine dispute of material fact as to whether McNally assumed the role of protector, counselor, and advisor. Accordingly, Gilfus has not shown that McNally owed him a fiduciary duty.

Even if Gilfus could demonstrate that McNally owed Gilfus a fiduciary duty, McNally did not breach the alleged duty because McNally was not obligated to include Gilfus in its transaction with Dobbs. Gilfus does not contend that McNally breached its alleged fiduciary duty by providing the Evaluation Materials to Dobbs. Doc. 111 at 29. Instead, Gilfus argues that McNally breached the alleged duty by pursuing an

acquisition of Nortrax that did not include him. *Id.* Although Gilfus alleges that the terms of the Second NDA compelled him to forgo any independent business transactions regarding John Deere thereby "locking up" Gilfus's use of his own confidential information, Doc. 38 ¶ 70, Gilfus does not point to evidence to support his claim of his information being "locked up." And, by the plain terms of the First NDA, McNally was not precluded from pursuing a venture with another company without Gilfus. *See* Doc. 88-2 at 3. Thus, even if a fiduciary relationship existed, Gilfus has not shown a breach of the purported fiduciary duty. Nor can Gilfus show that his damages were proximately caused by McNally's alleged breach because the evidence reflects Gilfus and McNally could not reach an agreement on remuneration and that John Deere refused to do business with Gilfus and his partners. *See* Doc. 92-1 ¶ 3–5; Doc. 90-3 ¶ 8, 12–14. Accordingly, McNally is entitled to summary judgment on Count II.

## C.    Promissory Estoppel

In Count III of his Amended Complaint, Gilfus sues McNally for promissory estoppel. He alleges McNally promised to provide him with a finder's fee, equity in the new company, and an employment contract in consideration for Gilfus providing the Evaluation Material to McNally. Doc. 38 ¶ 77. Gilfus further alleges that McNally made these promises to induce him to provide the key confidential information about the industry and that McNally knew that its promises would induce Gilfus to provide the information, which he did. *Id.* ¶¶ 78–80. Gilfus alleges McNally used the

Evaluation Material without providing him the promised finder's fee, equity, or employment contract. *Id.* ¶ 81.

In its motion for summary judgment, McNally argues that Gilfus cannot prevail on his claim for promissory estoppel because it did not promise Gilfus a finder's fee, equity in a new company following the purchase of Nortrax, or employment with that new company. Doc. 89 at 24. Next, McNally argues that Gilfus fails to show evidence of any action or forbearance on his part in reliance on the alleged promises of McNally. *Id.* at 25. Finally, McNally argues that no injustice will result due to Gilfus's inequitable conduct and unclean hands in using confidential material Hollister stole from Nortrax in creating the Evaluation Material.

In Florida, the basic elements of a claim for promissory estoppel, as set forth in Restatement (Second) of Contracts § 90 (1979), are:

> [1] A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and [2] which does induce such action or forbearance is binding if [3] injustice can be avoided only by enforcement of the promise.

*DK Arena, Inc. v. EB Acquisitions I, LLC*, 112 So. 3d 85, 93 (Fla. 2013) (citing *W.R. Grace and Co. v. Geodata Serv., Inc.*, 547 So. 2d 919, 924 (Fla. 1989)).

It is undisputed that the First NDA contained no provision for a finder's fee, equity in a new company, or a management employment contract. *See* Doc. 88-2; Doc. 95-2 ¶ 6. However, Gilfus contends that McNally brought up the issue of remuneration and did not oppose Gilfus's proposal. In support, Gilfus cites to his own deposition in which he testifies that Ward McNally at their first meeting asked Gilfus what he

wanted. In response, Gilfus consistently stated he wanted a finder's fee, equity, and an employment contract. Doc. 111 ¶ 26. According to Gilfus, Ward McNally responded that was "reasonable." Doc. 94-2 at 53, 57, 150, 183. In his responses to McNally's interrogatories, Gilfus states that in February 2017 McGrew similarly acknowledged that such requests were reasonable and McGrew said it would be discussed with potential investors. Doc. 95-1 at 9-10. Gilfus testified that he had meetings, notes, and phone calls over a period of eight months in which McNally told him they would get a finder's fee.[6] Doc. 94-2 at 164–66.

McNally disputes Gilfus's contentions. In his affidavit (Doc. 90-1), Ward McNally states that "[a]t no point during that January 3rd telephone call (or at any other time before or after such telephone call) did I offer Gilfus, Hollister or North a 'finder's fee,' equity in any new venture, or a management contract for their employment in any proposed new venture." *Id.* ¶ 12. Similarly, Frank McGrew states in his affidavit (Doc. 91-1) that "[a]t no point during that January 3rd telephone call (or at any other time before or after such telephone call) did Ward (or any McNally representative) offer Gilfus, Hollister or North a 'finder's fee,' equity in any new venture, or a management contract for their employment in any proposed new venture. Nor did Ward (or any McNally representative) ever tell Gilfus, Hollister or North that such consideration would be reasonable." Doc. 90-1 ¶ 12. McGrew further states he "never offered Gilfus, Hollister or North a 'finder's fee,' equity in any new

---

[6] Gilfus does not file copies of any notes or documents memorializing the meetings and calls.

venture, or a management contract for employment in any new venture. Nor did we ever even discuss the amount of a 'finder's fee,' the amount of equity in any new venture, or the terms of any potential management contract for employment in any new venture." Doc. 91-1 ¶ 16.

Thus, disputed issues of fact exist as to whether a finder's fee, equity, or an employment contract were discussed. However, even assuming the facts in a light most favorable to Gilfus, his claim for promissory estoppel still cannot stand. Accepting that Gilfus told McNally he wanted a finder's fee, equity, and employment contract and McNally or his representatives responded that such requests were reasonable, it is undisputed that, at best, the topics were discussed generally, and no specifics were ever discussed or agreed upon. In his deposition, Gilfus testified that he did not know what the finder's fee would be because it depended on the ultimate size of the transaction. *See* Doc. 94-2 at 102, 184, 186, 339. He did not have any specifics regarding an employment contract because it depended on the investor they found. *Id.* at 186. Gilfus testified that it never got to the point of identifying the amount of finder's fee because the number on which a finder's fee would be based was never determined. *Id.* at 339. Further, the parties never got to the point in the discussion where the terms of the employment agreements were ever defined. *Id.* at 338-40; Doc. 131 ¶ 13.

In Florida, claims for promissory estoppel must be "definite as to terms and time." *Hopkins Pontiac GMC, Inc. v. Ally Fin. Inc.*, 60 F. Supp. 3d 1252, 1261–62 (N.D. Fla. 2014) (citing *W.R. Grace & Co.*, 547 So. 2d at 924). Gilfus has offered no evidence that the parties ever agreed to any specifics regarding terms or time frame. At best,

27

Gilfus shows "a truthful statement as to the present intention of a party with regard to his future act," *W.R. Grace*, 547 So. 2d at 924, which is insufficient to establish a claim for promissory estoppel.

In a light favorable to Gilfus, the alleged promises made to him are still too indefinite in character to justify the application of promissory estoppel. There was never a discussion among the parties as to the amount of the finder's fee, the terms of an employment contract, or the amount of equity. "To be enforceable, an agreement must be sufficiently specific, and reflect assent by the parties to all essential terms. . . . Where essential terms of an agreement remain open, subject to future negotiation, there can be no enforceable agreement." *Bergman v. Delulio*, 826 So. 2d 500, 503, (Fla. 4th DCA 2002) (quoting *Suggs v. Defranco's Inc.*, 626 So. 2d 1100 (Fla. 1st DCA 1993)). It is clear that the discussions between Gilfus and McNally were, at best, subject to future negotiation. *See Gowni v. BP Corp. N. Am.*, No. 6:01-cv-1405-JA-KRS, 2003 WL 24051561, at *8 (M.D. Fla. May 9, 2003) (finding the alleged promises made to Mr. Gowni lacked the essential details necessary to apply the doctrine of promissory estoppel.).

In *Gowni*, the court found the plaintiffs' reliance on alleged promises to be unjustifiable where they knew that all discussions with defendant's representative were subject to the approval of Amoco's real estate department. *Id.* at *8. Similarly, here, it is undisputed that John Deere was very particular in choosing its business partners and that it would have to agree to any proposed venture involving Nortrax. Doc. 131 ¶¶ 44, 45. It is also undisputed that former John Deere executive Mark Germain and

Dobbs' executive Chris Crosby stated that John Deere and Nortrax would not sell Nortrax to a sponsor who intended to use Hollister, who had been fired from Nortrax. *Id.* ¶ 48. Germain did not believe that Gilfus was suited to serve in a leadership role at a Nortrax dealership. Doc. 92-1 ¶ 3.

Here, the alleged promises lacked essential details and were too indefinite to justify the application of promissory estoppel, and any claimed reliance on the alleged promises is unjustifiable where the evidence supports that Deere would not have pursued a venture that included Gilfus. Thus, McNally is entitled to summary judgment on this claim.

### D.    Unjust Enrichment

In Count IV, Gilfus sues McNally for unjust enrichment. "A claim for unjust enrichment is often referred to as a quasi-contract, or a contract implied in law." *Doral Collision Ctr., Inc. v. Daimler Tr.*, No. 3D21-1385, 2022 WL 2057573, at *3 (Fla. 3d DCA June 8, 2022) (citing *Com. P'ship 8098 Ltd. P'ship v. Equity Contracting Co., Inc.*, 695 So. 2d 383, 386 (Fla. 4th DCA 1997) ("To describe the cause of action encompassed by a contract implied in law, Florida courts have synonymously used a number of different terms—'quasi contract,' 'unjust enrichment,' 'restitution,' 'constructive contract,' and 'quantum meruit.'")). Under Florida law, to prevail on a claim for unjust enrichment, a plaintiff must show that: (1) plaintiff has conferred a benefit on the defendant, who had knowledge thereof; (2) defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without first paying the

value thereof to the plaintiff." *Duty Free World, Inc. v. Miami Perfume Junction, Inc.*, 253 So. 3d 689, 693 (Fla. 3d DCA 2018) (internal quotation marks and citations omitted). "At the core of the law of restitution and unjust enrichment is the principle that a party who has been unjustly enriched at the expense of another is required to make restitution to the other." *Gonzalez v. Eagle Ins. Co.*, 948 So. 2d 1, 3 (Fla. 3d DCA 2006).

McNally moves for summary judgment on Gilfus's unjust enrichment claim, arguing first that he conferred nothing of value to McNally and, second, that his inequitable conduct bars his claim as a matter of law. McNally argues that Gilfus's claim that he made introductions to unspecified persons in the agricultural industry is too vague to demonstrate the conferral of a benefit. Next, McNally claims the Evaluation Material was not Gilfus's to confer, and in any event, the material was of no benefit because John Deere was not interested in selling Nortrax as Gilfus proposed, but only in selling some of its Nortrax dealerships. Finally, McNally argues that any "education" Gilfus provided regarding the industry is amorphous and unsupported by record evidence. Doc. 89 at 28–31.

Gilfus responds that his sharing of the Evaluation Material under the First NDA apprised McNally of a business opportunity it otherwise would not have known about. Doc. 111 at 33.  While the record evidence reveals that Dobbs had familiarity with a potential Nortrax venture prior to Gilfus's disclosure of the Evaluation Materials, the parties have not directed the Court to any evidence demonstrating that McNally was already aware of the business opportunity. Thus, Gilfus's bringing the business opportunity to McNally is arguably a benefit. And, although McNally denies that it

participated in the ultimate venture, there is evidence that a McNally entity made a small (3.9%) co-investment in the holding company that owns Dobbs' interests in the seven Nortrax dealerships. Doc. 131 ¶ 52. This too creates a disputed question of fact as to whether Gilfus's sharing the idea with McNally conferred a benefit on McNally that it accepted.

As to whether it would be inequitable for McNally to retain the benefit without paying for it, the Court similarly concludes that questions of fact remain. McNally argues that Gilfus's unclean hands preclude any finding of inequity or any recovery on this claim.

The unclean hands doctrine is an equitable defense intended to discourage unlawful activity. *Bank of America, N.A. v. Pate*, 159 So. 3d 383, 385 (Fla. 1st DCA 2015) (Thomas, J., specially concurring). It closes the doors of a court of equity when a party has engaged in inequitable behavior or bad faith relative to the matter in which it seeks relief. *Id.* (citing *Congress Park Office Condos II, LLC v. First-Citizens Bank & Trust Co.*, 105 So. 3d 602 (Fla. 4th DCA 2013)). McNally argues that Gilfus, in preparing the Evaluation Materials, used information Hollister stole from Nortrax. McNally claims Gilfus turned a blind eye as to where the information came from notwithstanding knowing that Hollister had provided it to McNally after he had been terminated from Nortrax. It is undisputed that Gilfus used confidential information of Nortrax and/or John Deere in creating the Evaluation Materials. Doc. 131 ¶ 24. Gilfus testified he did not know how Hollister obtained the material. Doc. 113 at 29. In a light favorable to Gilfus, disputed issues of fact exist as to whether it would be

inequitable for McNally to retain the benefit conferred and whether McNally's unclean hands defense wholly bars Gilfus's claim.

The Eleventh Circuit has stated that for a defendant to avail itself of the doctrine of unclean hands, it must satisfy two requirements:

> First, the defendant must demonstrate that the plaintiff's wrongdoing is directly related to the claim against which it is asserted. *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245 (1933). Second, even if directly related, the plaintiff's wrongdoing does not bar relief unless the defendant can show that it was personally injured by her conduct. *Mitchell Bros. Film Group v. Cinema Adult Theater*, 604 F.2d 852, 863 (5th Cir. 1979), *cert. denied*, 445 U.S. 917 (1980).

*Calloway v. Partners Nat. Health Plans*, 986 F.2d 446, 450–51 (11th Cir. 1993). McNally does not offer evidence that it was injured by Gilfus's conduct.[7]

Accordingly, it is hereby

**ORDERED**:

1.  Plaintiff's Motion for Partial Summary Judgment (Doc. 88) is **DENIED**.

2.  Defendant's Motion for Summary Judgment (Doc. 89) is **GRANTED-IN-PART** and **DENIED-IN-PART**. McNally's motion is granted to the extent that McNally is entitled to summary judgment in its favor on Plaintiff's claims for breach of contract in Count I, breach of fiduciary duty in Count II, and promissory estoppel

---

[7] In its reply, McNally makes vague reference to Gilfus's conduct wasting its time and risking its relationships (Doc. 115 at 7), but McNally fails to direct the Court to any evidence to support this blanket statement. *See* Doc. 62 at 7 ("Both the movant and the party opposing summary judgment shall provide pinpoint citations to the pages and lines of the record supporting each material fact.").

in Count III of the Second Amended Complaint. McNally's Motion for Summary Judgment is denied as to Plaintiff's unjust enrichment claim in Count IV.

3.      On or before December 30, 2022, the parties shall file a joint notice advising the Court of the months in 2023 when they are available for trial of the remaining unjust enrichment claim. Upon receipt of the notice, the Court will schedule this case for trial.

4.      The Clerk is directed to re-open this case.

**DONE AND ORDERED** in Tampa, Florida on December 12, 2022.

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any